Wilburn DOBBS, Petitioner-Appellant, Cross-Appellee,

v.

Ralph KEMP, Respondent-Appellee, Cross-Appellant.

No. 84–8153.

United States Court of Appeals, Eleventh Circuit.

May 21, 1986.

Robert Altman, Atlanta, Ga. (Court-appointed), for petitioner-appellant, cross-appellee.

Mary Beth Westmoreland, Atlanta, Ga., for respondent-appellee, cross-appellant.

Before RONEY and ANDERSON, Circuit Judges, and MORGAN, Senior Circuit Judge.

CORRECTED OPINION

ANDERSON, Circuit Judge:

Appellant and cross-appellee, Wilburn Dobbs, is a Georgia prisoner currently under a sentence of death. In late 1980, he sought habeas corpus relief in the District Court for the Northern District of Georgia pursuant to 28 U.S.C. § 2254. The district court denied relief on the basis of alleged constitutional errors in the guilt/innocence phase of Dobbs' trial. However, while rejecting several of Dobbs' claims concerning the sentencing phase of his trial, the district court granted relief on the ground that the trial judge's instructions with regard to the function of mitigating circumstances under the Georgia death penalty statute were insufficient. Thus, Dobbs' death sentence was set aside subject to the state's right to institute resentencing proceedings. Finally, the district court reserved ruling on six additional sentencing phase issues raised by Dobbs.[1]

The state appeals the death sentence relief granted by the district court. Dobbs also appeals, pressing his guilt/innocence phase claims, and urging affirmance of the relief which the district court granted with respect to the sentencing phase, and also urging affirmance of that relief on alternative grounds. Oral argument was held on September 17, 1984. The parties were notified that the decision would be withheld pending disposition of *Peek v. Kemp,* No. 82–8713, which was argued before the en banc court on June 11, 1985. In light of this court's recent en banc opinion in *Peek v. Kemp,* 784 F.2d 1479 (11th Cir.1986) (en

banc), we reverse the judgment of the district court which had granted the writ on the basis of the trial judge's instructions regarding the function of mitigating circumstances under the Georgia death penalty statute. We affirm in all other respects, but remand the case to the district court for consideration of the sentencing phase claims with respect to which it reserved decision.

## PROCEDURAL HISTORY

On May 22, 1974, Dobbs was found guilty in the Superior Court of Walker County, Georgia of two counts of aggravated assault, two counts of armed robbery, and one count of murder.[2] Dobbs was sentenced to consecutive sentences of 10 years each on the aggravated assault conviction, to life imprisonment for each armed robbery conviction, and to death by electrocution for the murder conviction. Dobbs appealed the convictions and death sentence to the Georgia Supreme Court which affirmed in all respects. *Dobbs v. State,* 236 Ga. 427, 224 S.E.2d 3 (1976), *cert. denied,* 430 U.S. 975, 97 S.Ct. 1667, 52 L.Ed.2d 370 (1977).

Then, in July 1977, Dobbs petitioned for a writ of habeas corpus in the Superior Court of Tattnall County, Georgia. After an evidentiary hearing, all requested relief was denied. *Dobbs v. Hopper,* No. 77–185 (Tattnall Sup.Ct., Oct. 9, 1979). Dobbs filed an application for probable cause to appeal the superior court ruling which was denied by the Georgia Supreme Court on

---

1. Since the district court had granted Dobbs relief from his death sentence, it did not review the following six sentencing phase issues raised by Dobbs: (1) whether the sentencing phase jury charge was constitutionally defective because it failed to limit the jury's discretion in imposing the death sentence; (2) whether the admission of Dobbs' prior convictions during the sentencing phase of his trial was constitutional error; (3) whether the trial judge's refusal to answer a question about the availability of parole during the sentencing deliberations was constitutional error; (4) whether the jury's verdict was constitutionally inadequate; (5) whether the fact that the jury allegedly sentenced Dobbs to death thinking that Dobbs would not be executed constituted constitutional error;

and (6) whether Dobbs' sentence of death was imposed as a result of passion, prejudice, or other arbitrary considerations.

2. The convictions arose out of a violent incident at a convenience store in Chickamauga, Georgia, on December 14, 1973. A summary of the evidence adduced at trial is well presented in the Georgia Supreme Court's opinion on direct review. *Dobbs v. State,* 236 Ga. 427, 224 S.E.2d 3 (1976), *cert. denied sub nom., Dobbs v. Georgia,* 430 U.S. 975, 97 S.Ct. 1667, 52 L.Ed.2d 370 (1977). It is not necessary to review all the facts; those facts necessary to the adjudication of the issues presented will be supplied in the course of this opinion.

February 20, 1980. Dobbs sought a writ of certiorari in the United States Supreme Court which was also denied. *Dobbs v. Hopper*, 447 U.S. 930, 100 S.Ct. 3029, 65 L.Ed.2d 1125 (1980).

Additionally, while the state habeas petition was pending, Dobbs filed an extraordinary motion for a new trial. An evidentiary hearing was held, and a new trial was denied. *Georgia v. Dobbs*, No. 8403 (Walker Sup.Ct., Aug. 13, 1979). The Georgia Supreme Court affirmed, and the United States Supreme Court denied certiorari. *Dobbs v. State*, 245 Ga. 208, 264 S.E.2d 18, *cert. denied*, 446 U.S. 913, 100 S.Ct. 1845, 64 L.Ed.2d 267 (1980).[3]

## ISSUES

The following issues are presented to us on appeal:

(1) whether the following improprieties and evidentiary errors, individually and cumulatively, rendered Dobbs' trial fundamentally unfair under the Fourteenth Amendment: (a) prosecutor's improper closing argument at the guilt/innocence phase of the trial; (b) admission of evidence of another crime attributed to Dobbs; (c) introduction of testimony by prosecution which was known to be false and prejudicial; and (d) introduction of incriminating hearsay;

(2) whether the pre-trial identifications of Dobbs by two key witnesses were so suggestive as to unconstitutionally taint those witnesses' in-court identifications of Dobbs;

(3) whether the trial court's jury instruction unconstitutionally shifted the burden of proof to Dobbs as to the element of intent;

(4) whether the trial court's instruction as to the meaning of "assault" was improper and unconstitutional;

(5) whether the grand and traverse jury pools from which the jurors in Dobbs' case were selected were unconstitutionally composed;

(6) whether the process of "death qualifying" the jury under *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), created a jury which was conviction-prone and not fairly representative of the community;

(7) whether a potential juror was improperly removed on *Witherspoon* grounds;

(8) whether the court's instructions regarding mitigating circumstances were constitutionally deficient;

(9) whether Dobbs' attorney provided ineffective assistance during the sentencing phase; and

(10) whether the failure to transcribe counsels' closing arguments during the sentencing phase was unconstitutional.

Each of these issues will be discussed in turn below.

### I. WAS DOBBS' TRIAL FUNDAMENTALLY UNFAIR?

■ Improper prosecutorial argument and evidentiary errors are grounds for granting a writ of habeas corpus only when the trial is rendered fundamentally unfair. *Donnelly v. DeChristoforo*, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1973); *Shaw v. Boney*, 695 F.2d 528 (11th Cir.1983). We evaluate the following arguments pursuant to the fundamentally unfair standard.

#### A. *Prosecutor's Closing Argument at the Guilt Phase*

The state's attorney made the following closing argument at guilt/innocence trial:

I don't know. I could stand up here and talk a long time, but I do say this, there's people that it just ain't safe to have on your streets, and there is people that ain't safe to have around you, and

---

**3.** By virtue of the proceedings described in the text, Dobbs has exhausted all available state court remedies. *See* 28 U.S.C.A. § 2254(b).

there's people that it ain't safe, your property ain't, your life ain't, and if this evidence hasn't demonstrated such a case, study about it.

Of course, if you find that he didn't do it, or if you have a reasonable doubt, then you can acquit him.

When you do that, he'll walk out the door with everybody else.

Can you afford to take a chance?

 Dobbs argues that the above statement undermines the presumption of innocence and proper burden of proof required in a criminal trial. The state seems to admit that this statement was improper, but argues that it does not rise to the level of being fundamentally unfair. The prosecutor's statement was improper because it was a veiled implication that guilt beyond a reasonable doubt is or should be a permissive standard.

 The relevant precedents suggest that the statement is not of constitutional magnitude. "Prosecutorial remarks must be so prejudicial that they render the trial fundamentally unfair." *Donnelly v. De-Christoforo*, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1973); *Brooks v. Kemp*, 762 F.2d 1383 (11th Cir.1985) (en banc); *Cobb v. Wainwright*, 609 F.2d 754 (5th Cir.),[4] *cert. denied*, 447 U.S. 907, 100 S.Ct. 2991, 64 L.Ed.2d 857 (1980); *Houston v. Estelle*, 569 F.2d 372 (5th Cir.1978).

In light of the obscurity of the improper implication, in light of the clear and repeated instructions to the jury from the trial court itself that the jury had to find guilt beyond a reasonable doubt, and in light of the overwhelming evidence of Dobbs' guilt, Dobbs has fallen woefully short of demonstrating that his trial was rendered fundamentally unfair.

### B. Admission of Evidence of "Prior Crime"

In response to defense counsel's question to accomplice Walter Harris as to whether

a particular car was involved in the crime, Harris answered: "No, sir, but it had something to do with Mr. Lemenick's hold-up." Immediately thereafter, defense counsel moved for a mistrial. The court refused to order a mistrial, but offered a curative instruction which defense counsel declined.

 Although Georgia and federal law do not permit evidence of prior crimes except for limited purposes, the comment by Harris did not render the trial fundamentally unfair. As the district court indicated, the statement does not explicitly accuse Dobbs of a prior crime by any means. Even assuming that the jury attributed the so-called Lemenick hold-up to Dobbs, it would have been a very insignificant factor in the case. An erroneous state evidentiary ruling will be considered fundamentally unfair only if it concerns a matter which is " 'material in the sense of a crucial, critical, highly significant factor.' " *Shaw v. Boney*, 695 F.2d 528, 530 (11th Cir.1983) (quoting *Hills v. Henderson*, 529 F.2d 397, 401 (5th Cir), *cert. denied*, 429 U.S. 850, 97 S.Ct. 139, 50 L.Ed.2d 124 (1976)).

### C. Testimony of Daisy Mae Yates

 Grace Foster, a witness who identified Dobbs as the perpetrator at trial,[5] was beaten severely at the scene of the crime. Foster's daughter, Daisy Mae Yates, testified that she was visiting her mother at a local hospital the afternoon after the crime. She further testified that she saw a man whom she later identified as Dobbs lurking around the hospital. Dobbs claims this evidence was improperly admitted because it conflicted with a police officer's testimony as to where Dobbs was at the time in question. He claims this discrepancy in testimony was extremely prejudicial because it indicates that he was trying to kill Ms. Foster at the hospital. Dobbs also argues that the prosecution knew or should have known that Ms. Yates' testimony was

---

**4.** In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir.1981) (en banc), this court adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the

close of business on September 30, 1981. *Id.* at 1209.

**5.** *See infra* Part II.

false. *See Miller v. Pate*, 386 U.S. 1, 87 S.Ct. 785, 17 L.Ed.2d 690 (1967). We find no merit in these arguments.

In fact, as the district court opinion indicates, the testimony of Yates and the police officer do not necessarily contradict each other. The police officer's testimony simply places Dobbs at a used car lot at approximately 2:30 p.m., which does not, of course, preclude the possibility that Dobbs was at the hospital at another time during the afternoon. Prejudicial evidence, if relevant and not otherwise infected with evidentiary error, is generally admissible. If the jury chose to believe Yates, her testimony, no matter how interpreted, seems relevant.

Dobbs also contends that the prosecutor's use of the Yates' testimony was unconstitutional because the prosecutor knew or should have known that the testimony was false. However, he presents no evidence of this and, as indicated above, Yates' testimony is not necessarily inconsistent with other evidence presented by the state. Thus, we reject Dobbs' claim with regard to the testimony of Ms. Yates.

#### D. *Admission of Hearsay Testimony*

■ At trial, Paul Young, an owner of a used car lot, stated that Dobbs paid him approximately $100 in a $50 bill and assorted smaller bills on the afternoon of the murder. This was potentially incriminating because accomplice Walter Harris' testimony indicated that Harris had taken a $50 bill from the murder victim before Dobbs killed him. Harris also testified that the money taken during the robbery, a total of $210, was split three ways, among Harris, Dobbs and another accomplice, after the crime. Upon cross-examination, defense counsel revealed that Young's in-court statement was hearsay because Dobbs had actually paid the $100 to Young's wife.

Dobbs claims that the "admission of such evidence ... was part of a blatant attempt to deny the petitioner a fundamentally fair trial. The testimony was an important element in the state's proofs." However, Dobbs does not elaborate further on the relative importance of this testimony nor does he cite any legal authority to support his claim.

In fact, given the other evidence adduced at trial, the hearsay probably had little or no effect. In addition, as the district court opinion pointed out, the cross-examination revealing that the money was paid to Young's wife, and that Young only heard of the payment from his wife, probably negated the effect, if any, of the hearsay. In any event, the admission was not of constitutional magnitude. *Shaw v. Boney*, 695 F.2d at 530-31 (evidence must be "crucial, critical, highly significant factor"; case involved double hearsay).

#### E. *Definition of the Word "Assault" in the Jury Instructions*

■ In its instructions, the trial court defined the term "aggravated assault" by reference to the word "assault," leaving the jurors temporarily with a somewhat circular definition. However, the indictments which were read aloud and taken to the jury room defined both assault counts with great specificity. The indictment substantially clarified the circular instruction. In the context of the trial as a whole, the instruction, even if viewed as improper, did not conceivably render the trial fundamentally unfair. *Carrizales v. Wainwright*, 699 F.2d 1053, 1055 (11th Cir.1983).

#### F. *Cumulative Effect of Trial Errors*

None of the alleged errors, considered alone, approach the threshold standard of fundamental fairness. Taken together, their cumulative effect also falls far short of rendering Dobbs' trial fundamentally unfair.

### II. IDENTIFICATION TESTIMONY OF EYE WITNESSES

At trial, witnesses William Austin and Grace Foster, who had been present at the scene of the crime, identified Dobbs as the perpetrator of the crime. Dobbs challenges these identifications as so unreliable as to violate due process.

 As a threshold matter, the state argues that Dobbs' claim concerning improper identifications has been waived for failure to object at trial. *Engle v. Isaac*, 456 U.S. 107, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982); *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). However, at the time of Dobbs' trial in 1974, the relevant Georgia law, 1967 Ga.Laws p. 835, permitted a defendant to raise federal constitutional claims in state habeas corpus proceedings in the absence of a knowing and intelligent waiver by the defendant. *Spencer v. Kemp*, 781 F.2d 1458 (11th Cir. 1986) (en banc). Since there is no allegation by the state that Dobbs relinquished his rights as contemplated by the Georgia statute then in effect, Dobbs may present his constitutional claim here.

On the merits, Dobbs argues that pre-trial photographic identifications of him made by Foster and Austin were impermissibly suggestive, rendering subsequent identifications at trial unreliable.

This circuit has adopted a two-step analysis in determining whether identifications such as the present ones are so unreliable as to violate due process. The court first must decide whether the original identification procedure was unduly suggestive. If so, the court must determine whether the procedure, given the totality of the circumstances, created a substantial risk of misidentification at trial. *United States v. Thevis*, 665 F.2d 616, 643 (5th Cir. Unit B), *cert. denied*, 459 U.S. 825, 103 S.Ct. 57, 74 L.Ed.2d 61 (1982); [6] *see also Manson v. Braithwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977).

 The district court concluded that the photographic identifications were impermissibly suggestive. Foster was shown 4 or 5 photographs, all of which were of Dobbs. *Cf. Manson v. Braithwaite, supra* (use of only one picture, that of the defendant, found suggestive). Austin was shown 12 photographs, 4 of which were of Dobbs and 2 of which were of white males (Dobbs is black). We agree with the district court that the use of multiple photos of Dobbs in the pre-trial identifications was unduly suggestive. Showing witnesses a series of pictures of which several are the same person can only be a calculated method at narrowing the witnesses' choice with regard to identification.

 The lower court, however, while holding the pre-trial procedure improperly suggestive, found that the identifications were reliable because of the witnesses' very close proximity to the perpetrator during the crime and the certainty with which the identifications were given at trial. *See id.* at 114, 97 S.Ct. at 2253 (citing these and other factors as evidence of reliability despite suggestive identification procedures). After a careful review of the trial record, we agree with the district court that the identifications were reliable.

Both Austin and Foster identified Dobbs at trial without hesitation. They both faced difficult cross-examinations [7] which attempted to undermine the reliability of their pre-trial identifications by, in part, challenging their physical and emotional capacities to observe and remember the events which transpired. However, their testimony indicates that they in fact accurately observed Dobbs during the course of the crime. Moreover, as the district court indicated, it is significant that both Foster and Austin were in very close proximity to Dobbs during the crime. Foster had the opportunity to observe Dobbs for a considerable period of time. While Austin only saw Dobbs for a "split second," we are convinced that the other factors present render his, as well as Foster's, in-court identification highly reliable.

---

6. In *Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir.1982), this court adopted as binding precedent all of the post-September 30, 1981, decisions of Unit B of the former Fifth Circuit. *Id.* at 34.

7. Foster was cross-examined on this issue during a pre-trial hearing. Austin was cross-examined at trial.

Having found that Dobbs has not met the standard for finding a pre-trial identification violative of due process, *United States v. Thevis*, 665 F.2d at 643, we affirm the decision of the district court in this regard.

## III. SANDSTROM ISSUES

The district court found that the trial judge's instruction regarding intent was impermissibly burden-shifting under *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979). The relevant instruction is as follows:

> I charge you that a crime is a violation of a statute of this state in which there shall be a union of joint operation of act and intention. I further charge you that the acts of a person of sound mind and discretion are presumed to be the product of the person's will, but this presumption may be rebutted. I charge you that a person of sound mind and discretion is presumed to intend the natural and probable consequences of his act, but this presumption may be rebutted.

> As to intent, I charge you that the intent to commit the crimes charged in this bill of indictment is an essential element that the state must prove beyond a reasonable doubt. Intent is always a question for the jury and is ordinarily ascertained by act and conduct. Intent may be shown in many ways, provided the jury finds that it existed from the evidence produced before them.

> Intent may be inferred from the proof and circumstances or by acts and conduct or it may be presumed when it is the natural and necessary consequences of the act.

The first paragraph of the above-quoted instruction is identical to the mandatory rebuttable burden-shifting instruction which was disapproved by the Supreme Court in the recent case of *Francis v. Franklin*, —— U.S. ——, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985).

The state argues that the instruction that intent *"may* be inferred from the proof and circumstances or by acts and conduct or it

*may* be presumed when it is the natural and necessary consequences of the act" is curative of the impermissible burden-shifting instruction. This instruction is a permissive presumption and, standing alone, it is constitutionally adequate. *See Lamb v. Jernigan*, 683 F.2d 1332, 1336–40 (11th Cir. 1982), *cert. denied*, 460 U.S. 1024, 103 S.Ct. 1276, 75 L.Ed.2d 496 (1983). However, when given in conjunction with the unconstitutional burden-shifting instruction, the otherwise permissible instruction fails to cure. The situation here is similar to that in *Franklin* where an instruction that " '*criminal* intention may not be presumed,' " *Franklin*, —— U.S. at ——, 105 S.Ct. at 1974, 85 L.Ed.2d at 357 (emphasis in original), was held not to cure the burden-shifting instruction. *Id.* at ——, 105 S.Ct. at 1975, 85 L.Ed.2d at 358 ("Language that merely contradicts and does not explain a constitutionally infirm instruction will not suffice to absolve the infirmity. A reviewing court has no way of knowing which of the two irreconcilable instructions the jurors applied in reaching their verdict"); *accord Davis v. Kemp*, 752 F.2d 1515, 1518–19 (11th Cir.) (en banc), *cert. denied*, —— U.S. ——, 105 S.Ct. 2689, 86 L.Ed.2d 707 (1985); *cf. Brooks v. Kemp*, 762 F.2d 1383, 1388–90 (11th Cir.1985) (en banc) (rejecting argument that instruction that "intent may be presumed" cured a mandatory rebuttable burden-shifting instruction as to malice, i.e., intent in the absence of provocation or justification, because "[a]t best, the contradictory instructions as to intent and malice may have confused the jury as to the proper burden of proof").

For much the same reason, we reject the state's argument that the general instructions as to presumption of innocence and burden of proof, and as to the state's proving intent beyond a reasonable doubt, cure the constitutional error. The *Sandstrom* court rejected this argument with respect to substantially identical allegedly curative instructions. 442 U.S. at 518 n. 7, 99 S.Ct. at 2456 n. 7 (the jury could have interpreted the conflicting instructions "as indicat-

ing that the presumption was a means by which proof beyond a reasonable doubt as to intent could be satisfied"); *see also Franklin,* — U.S. at ——, 105 S.Ct. at 1974, 85 L.Ed.2d at 357.

After a careful review of the entire jury charge, we find that a reasonable jury could well have concluded that Dobbs bore the burden of proof on the necessary element of intent. We thus conclude that the instruction violates *Sandstrom.*

The state maintains that, even if there was a *Sandstrom* error in this case, it was harmless. Dobbs argues that *Sandstrom* errors can never be considered harmless, but cites only the plurality opinion in *Connecticut v. Johnson,* 460 U.S. 73, 103 S.Ct. 969, 74 L.Ed.2d 823 (1983). The Supreme Court has recognized the plurality's position in *Connecticut v. Johnson* and expressly left open the question whether a *Sandstrom* error can ever be harmless. *Francis v. Franklin,* — U.S. at ——, 105 S.Ct. at 1977, 85 L.Ed.2d at 360. Moreover, our en banc court in several recent cases has reaffirmed for this circuit that a *Sandstrom* error, like most other errors of constitutional magnitude, can be held harmless beyond a reasonable doubt. *Brooks v. Kemp,* 762 F.2d at 1390; *Drake v. Kemp,* 762 F.2d 1449, 1453 (11th Cir. 1985) (en banc); *Tucker v. Kemp,* 762 F.2d 1496, 1501 (11th Cir.1985) (en banc); *Davis v. Kemp,* 752 F.2d at 1520–21; *McCleskey v. Kemp,* 753 F.2d 877, 902 (11th Cir.1985) (en banc). Thus, we consider the evidence presented at trial to determine whether the

*Sandstrom* error was harmless beyond a reasonable doubt.

Dobbs argues that the *Sandstrom* error here was harmful. He cites his trial attorney's testimony in the federal habeas proceeding below to the effect that Dobbs' conduct was probably impulsive. However, the district court seems to have discounted this evidence, relying instead on the otherwise overwhelming evidence as to Dobbs' presence in the store and role as triggerman. The district court's analysis misses the mark because a harmless error analysis under *Sandstrom* should focus on the element of intent. *Francis v. Franklin,* — U.S. at ——, 105 S.Ct. at 1977, 85 L.Ed.2d at 360; *Connecticut v. Johnson,* 460 U.S. at 86, 103 S.Ct. at 977 (plurality opinion); *id.* at 90, 96, 97, 99, 101, 103 S.Ct. at 979, 982, 983–84, 985 (Powell, J., dissenting); *Davis v. Kemp,* 752 F.2d at 1520 & n. 10. The fact that Dobbs was the triggerman is not conclusive of intent.[8]

The state argues that Dobbs presented no evidence at trial as to lack of intent since his defense was exclusively one of alibi. The fact that Dobbs' defense was one of alibi, although relevant to the analysis[9] is not conclusive because the state has the burden of proving each element, intent included, beyond a reasonable doubt.

▇▇▇ Nevertheless, we conclude that the evidence in the record negates any reasonable doubt as to intent. The trial testimony indicates that Dobbs struck Grace Foster several times prior to the killing of Roy

---

**8.** For example, if there was credible evidence in the trial record that Dobbs had pulled the trigger impulsively or accidentally, a reasonable doubt as to intent might well be raised.

The fact that there was overwhelming evidence that Dobbs was the triggerman does, however, eliminate the need to undertake the analysis pursued in *Drake v. Kemp,* 762 F.2d 1449, 1453–57 (11th Cir.1985) (en banc). Although there was overwhelming evidence in *Drake,* as in this case, that the actual killer intended to kill, because the theory that Drake was liable as an aider and abetter also had been submitted to the jury, the appellate court could not tell whether the jury had found that Drake was the actual killer or, on the other hand, whether he was merely an aider and abetter. In this case,

although the accomplice liability theory was included in the jury instructions, there was overwhelming evidence that Dobbs was the triggerman. Thus, we can readily conclude that the jury found that Dobbs was the actual killer. Moreover, since there was overwhelming evidence that the actual killer intended to kill, *see* discussion in text *infra,* the *Sandstrom* error was harmless.

**9.** *See Davis v. Kemp,* 753 F.2d 1515, 1521 (11th Cir.1985) (en banc) ("The defense presented by Davis was non-participation. The intent of the person or persons committing the crime was not a contested issue. Under these circumstances, the doctrine of harmless error is most appropriate.").

Sizemore, the murder victim. Dobbs also shot at (and missed) a bystander, William Austin, before firing the fatal shot at Sizemore.[10] Then, according to Foster's eyewitness testimony, Dobbs stood over Sizemore, who had previously been ordered by Dobbs to lie on the floor, and killed him by firing one shot into Sizemore's stomach from close range. Finally, before leaving the scene, Dobbs struck Foster in the head with the butt of his shotgun, rendering her unconscious.

The testimony of two other witnesses largely corroborates Foster's account of the incident. One of Dobbs' accomplices, Walter Lee Harris, testified to the same general sequence of violent events as did Foster, although he did not actually see the Sizemore killing. His testimony indicates as well that Dobbs was the mastermind of the crime.[11] Austin's testimony also corroborates Dobbs' assaultive behavior prior to the Sizemore killing.

The evidence described above indicates a series of purposeful and violent assaults on three individuals, including the killing of a defenseless man at close range. The overwhelming evidence negates any possibility that Dobbs was acting impulsively or otherwise unintentionally. Thus, we affirm the district court's finding that the *Sandstrom* error was harmless beyond a reasonable doubt.

In addition, Dobbs argues that the failure to transcribe his defense attorney's closing argument after the guilt/innocence phase of his trial makes review of the *Sandstrom* error impossible. Dobbs does

not elaborate upon this argument, but presumably he feels that his attorney, Donald Bennett, may have actually argued or hinted at lack of intent during his closing argument. Bennett testified at the federal habeas proceeding to the effect that his closing argument during the *sentencing* phase of the trial probably stressed that Dobbs' conduct during the crime was impulsive.

Bennett did not testify that his closing argument during the guilt/innocence phase of the trial similarly dealt with lack of intent and, of course, any argument during the sentence phase is irrelevant to the *Sandstrom* issue. Since Dobbs makes no showing whatsoever that lack of intent was argued during the guilt/innocence phase,[12] we hold that the failure to transcribe the closing argument did not prejudice Dobbs.

## IV. COMPOSITION OF GRAND AND TRAVERSE [13] JURIES

The state argues that Dobbs has waived this issue for failure to make timely objection. This claim of waiver is controlled by the discussion in Part II, *supra*. Because at the time of Dobbs' trial in 1974, the relevant Georgia law permitted a defendant to raise federal constitutional claims in state habeas corpus proceedings in the absence of a knowing and intelligent waiver, and because the state does not assert such a waiver, Dobbs did not waive his right to assert claims concerning jury composition. *Spencer v. Kemp*, 781 F.2d 1458 (11th Cir. 1986) (en banc).

---

**10.** There is a slight conflict in the testimony here. Foster testified that Dobbs fired at Austin after firing the fatal shot at Sizemore. Austin testified, however, that the first shot was fired at him. This discrepancy is not relevant to an intent inquiry and, thus, does not affect our harmless error analysis under *Sandstrom*.

**11.** Harris' testimony was later recanted. The Georgia Supreme Court rejected Dobbs' extraordinary motion for a new trial which was in part based on Harris' recantation. *Dobbs v. State*, 245 Ga. 208, 264 S.E.2d 18, *cert. denied*, 446 U.S. 913, 100 S.Ct. 1845, 64 L.Ed.2d 267 (1980).

**12.** It is highly unlikely that Bennett would have argued lack of intent, i.e., impulsiveness, at the close of the guilt/innocence phase because he had based his entire defense of Dobbs to that point on alibi.

**13.** In the headings of his various briefs and pleadings, Dobbs seems to indicate a claim concerning the composition of the traverse jury. However, Dobbs makes no specific arguments concerning the traverse jury. To avoid any present or future confusion, any implicit argument concerning the traverse jury is deemed abandoned because Dobbs has presented no evidence in this regard.

■ Dobbs challenges the selection process and composition of the grand jury venire with respect to women. Discriminatory selection of grand juries in state courts may be challenged under the Equal Protection Clause of the Fourteenth Amendment. *Alexander v. Louisiana,* 405 U.S. 625, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972); *Gibson v. Zant,* 705 F.2d 1543, 1546 (11th Cir.1983). In order to make out a prima facie case of grand jury discrimination, Dobbs must generally present evidence of the following three factors:

> First, the group allegedly discriminated against must be one that is a distinct class in society. Second, the group must be substantially underrepresented in the grand jury venires ... over a significant period of time. Third, the defendant must show that the selection procedure is not racially neutral or is susceptible to abuse as a tool of discrimination.

*Bryant v. Wainwright,* 686 F.2d 1373, 1375–76 (11th Cir.1982), *cert. denied,* 461 U.S. 932, 103 S.Ct. 2096, 77 L.Ed.2d 305 (1983), citing *Castaneda v. Partida,* 430 U.S. 482, 494, 97 S.Ct. 1272, 1280, 51 L.Ed.2d 498 (1977).

Evidence of grand jury discrimination was presented at the state habeas corpus hearing. Dobbs met the first part of the prima facie test because women have been held to constitute a recognizable and distinct class. *Taylor v. Louisiana,* 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975); *Gibson v. Zant,* 705 F.2d at 1547. In addition, Dobbs submitted proof of underrepresentation of women on the grand jury venire in Walker County, Georgia, the county in which Dobbs was indicted and tried. Dobbs presented the grand jury lists from which the grand jurors who indicted him were picked. Those lists were marked with an "M" next to male names and a "F" next to female names. Assuming a population of 50% women, the district court found that women were underrepresented on the grand jury venire by 16.6%. Our review of the evidence presented to the state habeas court and of the district court's interpretation of that evidence, indicates that the 16.6% disparity accurately reflects the underrepresentation of women on the Walker County grand jury venire. Furthermore, we agree with the district court that this degree of underrepresentation is constitutionally significant, *see, e.g., Hernandez v. Texas,* 347 U.S. 475, 480–81, 74 S.Ct. 667, 671–72, 98 L.Ed. 866 (1954) (14%); *Birt v. Montgomery,* 709 F.2d 690, 699 (11th Cir. 1983) (17.6%), *vacated,* 725 F.2d 587 (11th Cir.1984) (en banc) (decided on other grounds), although it is in the lower range found significant in prior cases. We also agree with the district court that Dobbs has shown underrepresentation "over a significant period of time." *Bryant v. Wainwright,* 686 F.2d at 1376. The data used by Dobbs spanned two years which falls within the lower range of time periods which the courts have found significant. *See Machetti v. Linahan,* 679 F.2d 236, 241–42 (11th Cir.1982) (20-month period), *cert. denied,* 459 U.S. 1127, 103 S.Ct. 763, 74 L.Ed.2d 978 (1983).

With regard to the third portion of the prima facie case, Sidney Porter, a jury commissioner for Walker County, testified as to how the grand jury lists for Walker County were compiled during the period in question. He stated that the jury commissioners, Porter himself and five others, took the most recent voter registration lists and divided them up equally. Each commissioner then screened the list for deceased persons and eliminated them. Then, the commissioner acted in a completely mechanical fashion. He or she picked every 5th, 6th or 10th name from the voter registration list. The names picked were then placed on the grand jury venire. No other selection criteria were used and the superior court judges played no role in the selection or composition of the grand jury venire. The process described by jury commissioner Porter, which is unrebutted by Dobbs, does not reflect systemic abuse or non-neutral selection criteria. *Cf. Bryant v. Wainwright,* 686 F.2d at 1378 (rejecting argument that the use of voter registration lists as a source for grand jury venires is, in itself, a tool of discrimination).

Since both the underrepresentation of women and the time period thereof are in the lower range of constitutional significance, and since the selection procedure employed was class neutral and mechanically applied,[14] we conclude that Dobbs has failed to make out a prima facie case of grand jury discrimination.

## V. VOIR DIRE ISSUES

### A. *"Death Qualified" Jury as Guilt Prone?*

Dobbs argues that the "death qualification" of the jury in his case under *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), produced a guilt prone jury which did not represent a cross-section of the community. The Supreme Court has rejected this argument. *Lockhart v. McCree,* — U.S. —, 106 S.Ct. 1758, 89 L.Ed.2d — (U.S.1986). Accordingly, the district court's decision declining to grant the writ on the basis of this claim is affirmed.

### B. *Witherspoon Exclusion of Juror Mitchell*

Dobbs challenges the exclusion of a juror, Virginia Mitchell, stating that on voir dire her opposition to the death penalty was not unequivocal and complete as required by *Witherspoon.* At issue is the following colloquy between the trial judge and Ms. Mitchell:

THE COURT: Now, Mrs. Mitchell, you said you were conscientiously opposed to capital punishment, that means inflicting the death penalty?

MRS. MITCHELL: Yeah.

THE COURT: Are your convictions and your opposition to that so fixed and so firm and so ingrained in you that you would never under any circumstances vote to impose the death penalty?

MRS. MITCHELL: No.

THE COURT: Is it so strong that you would ever refuse to consider imposing the death penalty?

MRS. MITCHELL: If it was my family I would still.

THE COURT: It wouldn't matter how severe the evidence might show a case to be, you would still refuse to invoke the death penalty?

MRS. MITCHELL: Yes, sir.

THE COURT: I'm going to let her off for cause.

There are two alleged ambiguities in the above colloquy. Ms. Mitchell's second answer would indicate lack of opposition to the death penalty in all circumstances if taken in isolation. However, given Ms. Mitchell's other answers, all reflecting opposition to the death penalty, it is clear that Ms. Mitchell misunderstood the question and was under the impression that she was again indicating unequivocal opposition to the death penalty. The trial judge's next question reveals his understanding that Ms. Mitchell was answering, in effect, that she would never impose the death penalty under any circumstances. The trial judge's understanding is reasonable, and is entitled to deference. *Wainwright v. Witt,* 469

---

**14.** We need not decide whether the failure to satisfy the third prong of the test, *i.e.,* defective selection procedure, would always operate as a per se bar to the establishment of a prima facie case. The ultimate "goal of this entire balancing process is ... to eliminate chance or inadvertence as a cause of the disparity; the statistical evidence must convince the court that discrimination is the only reasonable explanation ..." of underrepresentation. *Bryant v. Wainwright,* 686 F.2d 1373, 1377 (11th Cir. 1982). Here, as in *Bryant,* the statistical underrepresentation is in the low range of disparities which have been accorded constitutional significance. That being the case, "[a] selection process which can be easily maneuvered in a dis-

criminatory fashion is more likely to give rise to a presumption of discrimination than a selection process which would be difficult, but not impossible, to manipulate." *Id.* As discussed in the text, *supra,* the selection process used in this case was not subject to manipulation in a discriminatory fashion, but rather was neutral and mechanical in its application. *Compare Castenada v. Partida,* 430 U.S. 482, 494 n. 13, 97 S.Ct. 1272, 1280 n. 13, 51 L.Ed.2d 498 (1977) ("if a disparity is sufficiently large, then it is unlikely that it is due solely to chance or accident and, in the absence of evidence to the contrary, one must conclude that racial or other class-related factors entered into the selection process.").

U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985) (determination by state trial judge to exclude juror for "cause" under *Witherspoon* is a finding of fact to be accorded a presumption of correctness on habeas review under 28 U.S.C.A. § 2254(d)). Ms. Mitchell's third answer that "if it was my family I would still" does not indicate that she would impose the death penalty if a member of her family were a crime victim; rather, the use of the word "still" indicates that even if a member of her family were a victim she would still be opposed to the imposition of death. Therefore, we affirm the district court's decision that the *Witherspoon* exclusion of juror Mitchell was proper.

## VI. SENTENCING CHARGE REGARDING MITIGATING CIRCUMSTANCES

The district court granted the writ of habeas corpus with regard to the death sentence imposed upon Dobbs, holding that the sentencing instruction concerning mitigating circumstances was unconstitutional under *Westbrook v. Zant*, 704 F.2d 1487 (11th Cir.1983). In *Peek v. Kemp*, 784 F.2d 1479, 1494 (11th Cir.1986) (en banc), this court overruled *Westbrook* to the extent it is inconsistent with *Peek*. The *Peek* court rejected "the notion that the Constitution requires that the jury instructions include any particular words or phrases to define the concept of mitigation or the function of mitigating circumstances. It is sufficient from a constitutional standpoint if it is clear from the entire charge considered in context that a reasonable jury could not have misunderstood the meaning and function of mitigating circumstances." *Id.*

The sentencing judge in *Peek* had given an instruction authorizing the jury to " 'consider the facts and circumstances, if any, in extenuation, mitigation or aggravation of punishment.' " 784 F.2d at 1489. The court held that, while the sentencing instruction quoted above might not, standing by itself, adequately instruct the sentencing jury on the nature and function of mitigat-

ing circumstances, a "common sense evaluation of the proceedings in this case indicates that no reasonable juror could have failed to understand the challenged instructions and the role of mitigation." *Id.* at 1486; *see Cupp v. Naughten*, 414 U.S. 141, 147, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973).

In the instant case, examining the entire charge in context, as required by *Peek*, it is clear that no reasonable juror could have misunderstood the meaning and function of mitigating circumstances. In language virtually identical to that used in *Peek*, the trial court made the following statement:

in arriving at this determination you are authorized to consider all of the evidence received here in Court presented by the State and the defendant throughout the trial before you, you are authorized to consider the facts and circumstances, if any, in extenuation, mitigation, or aggravation of punishment, however, it is not essential to your decision that you find extenuating or mitigating facts and circumstances on the one hand or facts and circumstances in aggravation on the other.

Trial Transcript at 504–05. Although this statement did not define the meaning of "mitigation" or "extenuation" and did not allocate the mitigating and aggravating functions to the parties, "it did indicate clearly by use of the terms 'on the one hand' and 'on the other,' that the concepts of mitigation (or extenuation) and aggravation are opposite concepts, thus indicating that the 'facts and circumstances' relevant to these concepts would be presented for opposing purposes by the opposing parties." *Peek*, 784 F.2d at 1490.

Shortly thereafter, the judge explained to the jury:

The State and the defendant both will have the opportunity, if they see fit to do so, to go forward and present evidence in aggravation or evidence of mitigation or extenuation, and at this point I ask the State if you have anything in aggravation in these cases.

Trial Transcript at 506. After the state had introduced evidence of three prior con-

victions and counsel for both sides had made their closing arguments, the trial judge made this statement to the jury:

> Ladies and gentlemen, in this presentence investigation and the trial of this case, you have had evidence presented for your consideration by the State in aggravation, you have had argument by the State in aggravation, or what he contends is aggravation, and you have heard argument by counsel for the defendant in mitigation and extenuation.

*Id.* at 507. In addition, other instructions cautioned the jury that they were not authorized to recommend the death sentence unless they first found "beyond a reasonable doubt ... one of the aggravating circumstances which the Legislature has provided." *See, e.g.,* Trial Transcript at 511. The trial judge also described the particular statutory aggravating circumstance argued by the state, i.e., that the crime was committed while the defendant was engaged in the commission of another capital felony. *Id.* at 512. Moreover, the trial judge told the jury "you are not bound to sentence him to death even though you find there is an aggravating circumstance which the Legislature saw fit for a jury to consider." *Id.* at 516.

█ The above-quoted passages explicitly allocate the "aggravation" function to the state and the "mitigation and extenuation" function to the defendant. Thus, these statements clearly identified the state's role to adduce aggravating evidence and argument, and clearly indicated that such evidence and argument would be presented in support of the death sentence. Because the instructions cast mitigating circumstances in opposition to aggravating circumstances, and because the court clearly indicated that defense counsel's closing argument had been in support of mitigation and extenuation, we are satisfied that no reasonable juror could have misunderstood that it was the defendant's role to present mitigating evidence and argument, and that such evidence and argument would be presented in support of mercy, i.e., a life sentence. Considering the entire charge in context, we are confident that no reason-

able juror could have misunderstood the nature and function of mitigating circumstances and its own role in evaluating mitigating evidence and argument. Thus, in light of *Peek,* the trial court's jury instructions were not constitutionally deficient.

We therefore reverse the district court's grant of the writ of habeas corpus with regard to Dobbs' death sentence.

## VII. INEFFECTIVE ASSISTANCE OF COUNSEL DURING SENTENCING PHASE

Dobbs maintains that his trial counsel, Donald Bennett, provided ineffective assistance in the sentencing phase of the trial. Dobbs outlines in detail many avenues of investigation with regard to mitigating evidence which he maintains were open to Bennett during the sentencing phase. He has included with his federal habeas petition affidavits from 19 individuals which attest to Dobbs' good character and the fact that they would have testified in Dobbs' behalf if they had been contacted at the time of the trial. While conceding that Bennett may have done a better job in developing mitigating evidence, the district court found that Bennett "performe[d] a reasonably substantial investigation." Our review of the record and Bennett's testimony during the federal habeas proceeding, lead us to agree that Bennett's investigation was adequate. *Cf. Strickland v. Washington,* 466 U.S. 668, 691, 104 S.Ct. 2052, 2066, 80 L.Ed.2d 674, 695 (1984) ("In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness, applying a heavy measure of deference to counsel's judgments.").

█ The district court concluded, in addition, that Bennett's decision not to put on any mitigating evidence during the sentencing phase was a reasonable tactical judgment. Knowing of Dobbs' poor reputation in the community, Bennett testified in the district court that he did not want to put on any "positive" character testimony for fear that it would not be persuasive and would

prompt damaging counter evidence from the prosecution. After reviewing the record, we agree with the district court's finding that Bennett's failure to put on mitigating evidence was a tactical judgment, and was not, as Dobbs maintains, based on a fear that he would be rebuffed by the trial judge. We cannot say that Bennett's decision not to present mitigating evidence was unreasonable.[15] *See generally Strickland v. Washington,* 466 U.S. at 684–91, 104 S.Ct. at 2063–67, 80 L.Ed.2d at 691–96. Therefore, we affirm the district court's conclusion that Bennett exercised reasonable professional judgment and rendered effective assistance of counsel.

## VIII. FAILURE TO TRANSCRIBE CLOSING ARGUMENTS

Dobbs argues that the state's failure to transcribe closing arguments during the sentencing phase made proper review of the record impossible, thereby creating a "substantial risk that the penalty is being inflicted in an arbitrary and capricious manner," citing *Stephens v. Zant,* 631 F.2d 397, 403 (5th Cir.1980), *modified,* 648 F.2d 446 (5th Cir. Unit A June 19, 1981), *rev'd on other grounds,* 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983).

Dobbs suggests that the transcript is necessary to properly evaluate several claims including his *Sandstrom* claim, and his ineffective assistance of counsel claim. However, we have concluded in Part III, *supra* that the absence of the transcript does not assist Dobbs' *Sandstrom* claim, and our analysis in Part VII, *supra,* indicates that the transcript would not reveal ineffectiveness.

Dobbs also maintains that given the impropriety of the prosecutor's closing argument during the guilt/innocence phase,[16]

the Constitution requires that his sentencing argument be scrutinized as well. In the habeas proceeding below, the court considered evidence from Dobbs' trial attorney and the court reporter, and concluded that there was no suggestion that the prosecutor's closing argument was inflammatory. Our review of the record leads us to the same conclusion. Therefore, we affirm the district court's decision in this regard. *See Corn v. Zant,* 708 F.2d 549, 560 (11th Cir. 1983) ("Absent any showing of harm by petitioner, it is settled that failure to transcribe counsel's arguments is not a constitutional violation requiring vacation of a death sentence."), *cert. denied,* 467 U.S. 1220, 104 S.Ct. 2670, 81 L.Ed.2d 375 (1984).[17]

## CONCLUSION

For the foregoing reasons, the district court's judgment is reversed with respect to the instructions on mitigating circumstances, affirmed in all other respects, and remanded to the district court for consideration of the sentencing phase claims with respect to which it reserved decision.

REVERSED in part, AFFIRMED in part and REMANDED.

---

**15.** Although Bennett did not present any mitigating evidence, his testimony in the district court reveals that he did make a closing argument in mitigation.

**16.** *See supra* Part I.A.

**17.** *Stephens v. Zant,* 631 F.2d 397 (5th Cir.1980), *modified,* 648 F.2d 446 (5th Cir. Unit A June 19,

1981), *rev'd on other grounds,* 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983), cited by Dobbs in support of his "failure to transcribe" argument, is not supportive; if anything, it favors the state's position because it implies that petitioner must make some showing of prejudice in order to prevail. 631 F.2d at 402–04.