Wilburn DOBBS, Petitioner,

v.

Walter D. ZANT, Warden, Georgia Diagnostic and Classification Center, Respondent.

Civ. A. No. 4:80–CV–247–HLM.

United States District Court,
N.D. Georgia,
Rome Division.

Aug. 7, 1989.

Michael Kennedy McIntyre, Office of Michael Kennedy McIntyre and Robert Altman, Office of Robert Altman, Atlanta, Ga., for Wilburn Dobbs, petitioner.

Mary Beth Westmoreland, Office of State Atty. Gen., Atlanta, Ga., for Walter D. Zant, respondent.

## ORDER

HAROLD L. MURPHY, District Judge.

Wilburn Dobbs is a Georgia inmate currently under a death sentence. He was convicted in 1974 in the Superior Court of Walker County of two counts of aggravated assault, two counts of armed robbery, and one count of murder. All the convic- tions arose from an incident at a convenience store in Chickamauga, Georgia in 1973.

This Court previously denied habeas corpus relief on all of Dobbs' guilt/innocence claims and some of his sentencing phase claims, but granted relief on his claim that the trial court's instruction on mitigating circumstances was inadequate. A ruling on Dobbs' remaining sentencing claims was reserved at that time. Both Dobbs and the State appealed the decision to the Eleventh Circuit, which affirmed on all grounds except the mitigating circumstances claim, which it reversed. *Dobbs v. Kemp,* 790 F.2d 1499 (11th Cir.1986), *reh'g denied with modifications,* 809 F.2d 750, *cert. denied,* 481 U.S. 1059, 107 S.Ct. 2203, 95 L.Ed.2d 858 (1987). The Eleventh Circuit remanded the case to this Court to consider Dobbs' remaining sentencing claims which this Court had previously reserved deciding.

The claims now before the Court are as follows: (1) the introduction at the sentencing phase of prior convictions was improper because the convictions had been obtained unconstitutionally; (2) the jury charge failed to limit the jury's discretion to impose the death penalty; (3) passion, racial prejudice, and other arbitrary factors affected the sentencing decision; (4) the jurors voted for death automatically upon finding Dobbs guilty of murder; (5) the trial judge refused to answer the jury's question regarding parole; (6) the language of the verdict form was unconstitutional; and (7) the jurors did not think that Dobbs would in fact be executed.

Before analyzing the claims, the Court notes that during discovery following the Eleventh Circuit's remand order, the Court permitted Dobbs to depose the jurors in his case. The State objected based on Federal Rule of Evidence 606(b),[1] which generally

---

1. Rule 606(b) reads as follows:

   Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or as to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's men- tal processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to bear upon any juror. Nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

bars post-verdict testimony of jurors. The State argued that although the jurors could testify about extraneous influences, they could not testify about the deliberations, and that the line between those types of evidence is too fine to permit testimony by depositions.

The Court decided to permit the depositions solely because one of Dobbs' claims was that race was a factor in his sentencing decision, and the recent Supreme Court opinion in *McCleskey v. Kemp*, 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987), requires that Dobbs demonstrate actual prejudice in his case. Although the Court permitted the depositions to be taken for discovery purposes, it reserved ruling on the admissibility of the evidence until it decided the merits of Dobbs' claims. For the reasons provided in this order, the jurors' statements are admissible for some purposes but not for others.

### I. *Admission of Prior Convictions*

Dobbs argues that, in violation of the constitution, the State used evidence of two prior uncounseled convictions and a guilty plea in which the record does not show that Dobbs was informed of his constitutional rights. He maintains that the jurors relied on those convictions in part in deciding on the death penalty.

The State responds that Dobbs' claim has not been properly presented in this Court, and has not been exhausted in the state courts. The State argues further that the convictions were not used improperly and that, in any event, the trial jurors did not consider the convictions at the death penalty phase of Dobbs' trial.

■ Pretermitting the State's procedural arguments, the Court finds that Dobbs is not entitled to relief on the merits of his claim. After the jury returned its guilty phase verdict, the prosecutor did tender evidence of prior convictions for forgery, escape and shoplifting. However, in its charge to the jury, the trial court unambiguously stated that the evidence of prior convictions could not be considered during the death penalty deliberations. Trial Transcript at 508. Further, as the Eleventh Circuit has found, the trial court charged the jury that the only aggravating factor argued by the State was that the murder was committed while Dobbs was engaged in the commission of another capital felony. 790 F.2d at 1513; *see also* Trial Transcript at 512.

■ Dobbs argues, nevertheless, that one of the jurors stated in her deposition that she voted for the death penalty because of "the things he done before," and that her statement shows that the jury *did* consider Dobbs' prior convictions during the sentencing deliberations. First, because the jurors' statements were taken 15 years after the trial, their recall of their understanding of the instructions has little relevance under Federal Rule of Evidence 401. Second, the statement is inadmissible under Federal Rule of Evidence 606(b), because it is a post-decision statement of a juror about her mental process in reaching the decision. *See Fulghum v. Ford*, 850 F.2d 1529, 1535 (11th Cir.1988), *cert. denied*, — U.S. —, 109 S.Ct. 802, 102 L.Ed.2d 793 (1989).

The legislative history behind Rule 606(b) supports that construction. The Supreme Court transmitted a version of the rule to the House of Representatives. The House Judiciary Committee proposed a more expansive scope of admissible juror testimony. The Senate Judiciary Committee disagreed with that expansion, stating in part that the House version "would have the effect of opening verdicts up to challenge on the basis of what happened during the jury's deliberations, for example, where a juror alleged that the jury refused to follow the trial judge's instructions...." Congress eventually enacted the Senate version. *Tanner v. United States*, 483 U.S. 107, 122–25, 107 S.Ct. 2739, 2748–49, 97 L.Ed.2d 90 (1987); *see also Watson v. State of Alabama*, 841 F.2d 1074, 1076 n. 2 (11th Cir.) ("jurors are incompetent to testify as to the effect of a[n] ... instruction on the jury's deliberation or a juror's thought processes...."), *cert. denied*, — U.S. —, 109 S.Ct. 164, 102 L.Ed.2d 134 (1988). Therefore, a claim that the jury misunderstood or misapplied the law can be shown

only by proof that the jury instructions are not clear and accurate.

The Court concludes that the trial court's instruction to the jury not to consider the prior convictions shows that the convictions did not affect the sentencing decision. Habeas relief on this ground must be denied.

## II. *The Charge on the Jury's Discretion*

Dobbs argues that the trial court committed constitutional error in instructing the jury on the method for determining whether to impose the death penalty. Dobbs cites portions of the charge, where the judge stated that "the law provides no standards for the guidance of the jury in the selection of the penalty," and that "the only standard, if any, that you will be permitted to consider ... is the question of whether or not you find beyond a reasonable doubt that [an aggravating circumstance exists]." Dobbs stresses that the charge was misleading because the jurors were not told clearly (1) that they could decide not to impose the death penalty even if an aggravating circumstance were found to exist and (2) that they were obligated to consider evidence in mitigation.

The State responds that the resolution of this issue is governed by the Eleventh Circuit's decision finding the trial court properly charged the jury on the nature and function of mitigating circumstances.

Under Georgia law, a jury must find that an "aggravating factor" exists before it can impose the death penalty. The purpose of aggravating factors, therefore, is to "narrow[ ] the class of persons convicted of murder who are eligible for the death penalty." *Zant v. Stephens*, 462 U.S. 862, 874, 103 S.Ct. 2733, 2741, 77 L.Ed.2d 235 (1983). Once an aggravating factor is found, the jury has "absolute discretion" whether to impose the death penalty by considering "all evidence in extenuation, mitigation and aggravation of punishment." *Id.* at 862, 103 S.Ct. at 2735.

In its decision on the trial court's charge on the nature and function of mitigating circumstances in Dobbs' case, the Eleventh Circuit first cited instructions that, it found, accurately explained the difference between aggravating and mitigating circumstances. The Court then stated as follows:

> In addition, other instructions cautioned the jury that they were not authorized to recommend the death sentence unless they first found 'beyond a reasonable doubt ... one of the aggravating circumstances which the Legislature has provided.' *See, e.g.,* Trial Transcript at 511. The trial judge also described the particular statutory aggravating circumstance argued by the state, *i.e.,* that the crime was committed while the defendant was engaged in the commission of another capital felony. *Id.* at 512. Moreover, the trial judge told the jury "you are not bound to sentence him to death even though you find there is an aggravating circumstance which the Legislature saw fit for a jury to consider." *Id.* at 516.

*Dobbs v. Kemp*, 790 F.2d at 1513. Based on this passage from the Eleventh Circuit's opinion and the Court's independent reading of the entire charge, the Court finds that the jury instructions accurately and adequately explained the contours of the jury's discretion vis-a-vis aggravating circumstances. Contrary to Dobbs' contention, the jury was informed that they could decide not to impose the death penalty even if an aggravating circumstance were found to exist. Comments by some of the jurors in their depositions, which Dobbs reads as evidencing a misunderstanding of the law, are neither relevant under Federal Rule of Evidence 401 nor admissible under Federal Rule of Evidence 606(b), for the reasons discussed above.

Dobbs claims further, though, that the instruction on mitigating circumstances was constitutionally infirm because it did not inform the jury that they were required to consider evidence in mitigation. Although the Eleventh Circuit decided that the charge properly informed the jury of the nature and function of mitigating circumstances, the decision did not expressly reach whether the jury's discretion to consider those circumstances was channeled properly.

Dobbs cites two cases, decided after the Eleventh Circuit's decision, to support his claim. In *Hitchcock v. Dugger,* 481 U.S. 393, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987), a capital case from Florida, the jury was instructed to consider statutory mitigating circumstances only in deciding whether to recommend the death penalty.[2] Further, in imposing sentence, the trial judge said that he was "mandated to apply the facts to certain enumerated 'aggravating' and 'mitigating' circumstances." The Supreme Court ruled that the consideration of mitigating circumstances could not be limited to those contained in a statute, but that nonstatutory mitigating circumstances must be considered as well. *Id.* at 397–99, 107 S.Ct. at 1823–24.

In *Penry v. Lynaugh,* — U.S. —, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), the other case cited by Dobbs, the Supreme Court found that the application of the Texas death penalty statute prevented the petitioner from presenting evidence in mitigation.[3] The statute provides that the jury be instructed to answer three "special issues:" (1) whether the defendant acted deliberately or with the reasonable expectation that death would result; (2) whether the defendant would be a continuing violent threat to society; and (3) if applicable, whether the killing was an unreasonable response to any provocation by the deceased. If all three questions are answered in the affirmative, then the judge must enter a death sentence.

At his trial, Penry had presented evidence of his mental retardation and abuse as a child. The Supreme Court found that although the application of the Texas statute permitted the jury to consider that evidence in mitigation of punishment, the special issues prevented the jury from giving effect to that evidence. The Court reasoned as follows:

"In contrast to the carefully defined standards that must narrow a sentencer's discretion to *impose* the death sentence, the Constitution limits a State's ability to narrow a sentencer's discretion to *decline to impose* the death sentence." *McCleskey v. Kemp,* 481 U.S. 279, 304, 107 S.Ct. 1756, 1773, 95 L.Ed.2d 262 (1987) (emphasis in original). Indeed, it is precisely because the punishment should be directly related to the personal culpability of the defendant that the jury must be allowed to consider and give effect to mitigating evidence relevant to a defendant's character or the circumstances of the offense. Rather than creating the risk of an unguided emotional response, full consideration of evidence that mitigates against the death penalty is essential if the jury is to give a " 'reasoned *moral* response to the defendant's background, character, and crime.' " *Franklin [v. Lynaugh],* 487 U.S. [164] at —[, 108 S.Ct. 2320, 2332, 101 L.Ed.2d 155 (1987) ] (opinion concurring in judgment) (quoting *California v. Brown,* 479 U.S. [538,] 545 [107 S.Ct. 837, 841, 93 L.Ed.2d 934] [1987] (concurring opinion)). In order to ensure "reliability in the determination that death is the appropriate punishment in a specific case," *Woodson v. North Carolina,* 428 U.S. [280,] 305 [96 S.Ct. 2978, 2991, 49 L.Ed.2d 944] [ (1976) ], the jury must be able to consider and give effect to any mitigating evidence relevant to a defendant's background, character, or the circumstances of the crime.

109 S.Ct. at 2951. The *Hitchcock* and *Penry* decisions, therefore, stand for the proposition that the decision makers in capital cases must be able to consider, and give effect to, unrestricted mitigating circumstances. *See id.* at 2947.

Dobbs is correct that the trial court did not explicitly state that the jury was obligated to consider mitigating circumstances. In contrast to the situations in *Hitchcock* and *Penry,* however, the jury charge did not limit the jury's consideration of circum-

---

**2.** Under the Florida capital sentencing system, unlike the Georgia system, the jury issues a recommendation as to sentence. The trial court then decides whether or not to accept that recommendation. *See Spaziano v. Florida,* 468 U.S. 447, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984).

**3.** The Supreme Court had previously upheld the facial validity of the statute on an Eighth Amendment challenge in *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976).

stances that Dobbs wanted to present in mitigation and did not limit the effect of those circumstances in terms of the penalty decision. Neither Georgia law nor the charge, therefore, placed *any* restrictions on mitigating circumstances in Dobbs' case.

Moreover, at sentencing, Dobbs' attorney did not present evidence in mitigation, but did make argument in mitigation. *See Dobbs v. Kemp*, 790 F.2d at 1514 n. 15; Trial Transcript at 507.[4] As the Eleventh Circuit has commented in another case where no evidence in mitigation had been presented, "[w]e refuse to admonish the trial judge for wisely deciding not to belabor instructions on mitigation where the effect would have been to emphasize that there was no mitigating evidence on the defendant's behalf." *High v. Kemp*, 819 F.2d 988, 992 (11th Cir.1987), *cert. denied,* — U.S. ——, 109 S.Ct. 3264, 106 L.Ed.2d 609 (1989).

In sum, the charge accurately explained the nature and function of mitigating circumstances, *Dobbs v. Kemp*, 790 F.2d at 1512–13, and the trial court did not restrict the jury's ability to consider and give effect to mitigating circumstances. Further, the charge emphasized that the jury was not bound to impose the death penalty even if an aggravating circumstance was found. *See* Trial Transcript at 516. The jury's discretion to impose the death penalty was therefore channeled properly.

### III. *Passion, Prejudice, and Other Arbitrary Factors*

Dobbs claims that the jurors' decision to impose the death penalty in his case was based on racial prejudice, in that he is black and the victim was white, as well as other arbitrary factors, in violation of his constitutional rights to an impartial jury under the Sixth Amendment, to be free of cruel and unusual punishment under the Eighth Amendment, and to equal protection of the laws under the Fourteenth Amendment. The arbitrary factors other than race are the introduction of prior convictions, the

jury's belief that the death penalty was automatically warranted once Dobbs was found guilty of murder, improper jury instructions, and the trial court's failure to respond to the jury's question concerning parole. Because Dobbs has raised these alleged arbitrary factors as separate claims as well, the Court will address the issue of racial prejudice in this section and will resolve the claims of other arbitrary factors under their individual headings.

The Court's analysis of the racial prejudice issue is shaped in large part by the recent Supreme Court opinion in *McCleskey v. Kemp*, 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987). Similar to the situation in Dobbs' case, McCleskey, a black man whose victim was white, was sentenced to death. Proceeding under the Equal Protection Clause as well as the Eighth Amendment, McCleskey argued that the Georgia capital sentencing process was being administered in a racially discriminatory manner. As proof, he presented a statistical study showing that, in Georgia, murderers of whites receive the death penalty more often than murderers of blacks and, within the first group, black murderers of whites receive the death penalty more often than white murderers of whites.

Dobbs' claims differ from McCleskey's in that Dobbs is challenging the constitutionality of his death sentence in particular as opposed to the death penalty process in general. Nevertheless, *McCleskey* discloses two standards for the instant case. First, under the Equal Protection Clause, a habeas petitioner

> has the burden of proving "the existence of purposeful discrimination." *Whitus v. Georgia,* 385 U.S. 545, 550 [87 S.Ct. 643, 646, 17 L.Ed.2d 599] (1967). A corollary to this principle is that a criminal defendant must prove that the purposeful discrimination "had a discriminatory effect on him." *Wayte v. United States,* 470 U.S. 598, 608 [105 S.Ct. 1524, 1531, 84 L.Ed.2d 547] (1985). Thus, to prevail un-

---

4. Counsel's failure to present evidence in mitigation did not constitute ineffective assistance.

*Dobbs v. Kemp,* 790 F.2d at 1513–14.

der the Equal Protection Clause, [the petitioner] must prove that the decision-makers in *his* case acted with discriminatory purpose.

*McCleskey,* 481 U.S. at 292, 107 S.Ct. at 1766 (emphasis in original). Because of the discretion Georgia law affords the jury to impose a death sentence, "exceptionally clear proof" of purposeful discrimination is required. *Id.* at 297, 107 S.Ct. at 1769.

Second, under the Eighth Amendment, " 'respect for humanity ... requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death.' " *Id.* at 303, 107 S.Ct. at 1772, *quoting Woodson v. North Carolina,* 428 U.S. 280, 304, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976). The Supreme Court stated that "there is, of course, some risk of racial prejudice influencing a jury's decision in a criminal case ... The question 'is at what point that risk becomes constitutionally unacceptable.' " *Id.* 481 U.S. at 308–09, 107 S.Ct. 1775, *quoting Turner v. Murray,* 476 U.S. 28, 36 n. 8, 106 S.Ct. 1683, 1688 n. 8, 90 L.Ed.2d 27 (1986).

Measured against these standards, the Supreme Court affirmed the denial of habeas corpus relief in *McCleskey.* Under the Equal Protection Clause, the Court ruled, the statistics did not support an inference that the jurors in McCleskey's particular case acted with discriminatory purpose in

deciding to impose death. Further, under the Eighth Amendment, the Court held that the safeguards built into Georgia's capital sentencing procedures (*e.g., voir dire* proceedings, change of venue motion), together with the fundamental value of the jury system, minimize the effects of racial bias such that statistics are insufficient "to demonstrate a constitutionally significant risk of racial bias affecting the Georgia capital-sentencing process."

Under Dobbs' Equal Protection claim, therefore, Dobbs must show that the jurors acted with discriminatory purpose when they decided to impose the death penalty. *See McCleskey,* 481 U.S. at 292, 107 S.Ct. at 1766, *citing Wayte,* 470 U.S. at 608, 105 S.Ct. at 1531;[5] *Bundy v. Dugger,* 850 F.2d 1402, 1414 (11th Cir.1988), *cert. denied,* — U.S. ——, 109 S.Ct. 849, 102 L.Ed.2d 980 (1989). Under Dobbs' Eighth Amendment claim, the standard is less stringent: Dobbs must show that the jurors possessed racial biases that created an "unacceptable risk" that race affected the sentencing decision.[6]

The application of these standards presents a difficult evidentiary issue concerning the admissibility of juror testimony. Under Federal Rule of Evidence 606(b), as stated, "post-decision statements by a judge or juror about his mental processes in reaching [a] decision may not be used as evidence in a subsequent challenge to the decision." *Proffitt v. Wainwright,* 685 F.2d 1227, 1255 (11th Cir.1982), *cert.*

---

**5.** In *Wayte,* the defendant argued that the government selected him for prosecution for failing to register for the draft because he was a vocal opponent to the draft, and that the government's selection of him for exercising his constitutional rights was discriminatory. The Supreme Court rejected his claim because the evidence did not show "that the Government prosecuted him *because of* his protest activities." 470 U.S. at 610, 105 S.Ct. at 1532 (emphasis in original).

By citing *Wayte* in its *McCleskey* opinion, the Supreme Court conveyed that a habeas petitioner in a capital case who alleges that the sentencing decision was racially discriminatory in violation of the Equal Protection Clause must show that the jurors sentenced him to die because of his race.

**6.** For all practical purposes, the distinction between the Equal Protection claim and Eighth

Amendment claim is not significant in a capital case: if the evidence shows an "unacceptable risk" that race affected the sentencing decision under the Eighth Amendment standard, then the petitioner would be entitled to relief whether or not he went further and proved that race was actually a motivator in the decision, in violation of the Equal Protection Clause. The "unacceptable risk" standard, however, applies to capital cases only. *See Turner v. Murray,* 476 U.S. at 33, 35 n. 7, 36 n. 8, 106 S.Ct. at 1686, 1688 n. 7, 1688 n. 8 (distinguishing *Ristaino v. Ross,* 424 U.S. 589, 96 S.Ct. 1017, 47 L.Ed.2d 258 (1976), as a noncapital case). A petitioner in a noncapital case could not rely on the Eighth Amendment standard, but would have to show that race was actually a factor in his sentencing. The distinction between the two types of claims must therefore be drawn.

*denied,* 464 U.S. 1002, 1003, 104 S.Ct. 508, 509, 78 L.Ed.2d 697 (1983). However, a juror *can* testify concerning "any mental bias in matters unrelated to the specific issues that the juror was called upon to decide and whether extraneous prejudicial information was improperly brought to the juror's attention." *Rushen v. Spain,* 464 U.S. 114, 121 n. 5, 104 S.Ct. 453, 457 n. 5, 78 L.Ed.2d 267 (1983); *see Fulghum v. Ford,* 850 F.2d 1529, 1535 (11th Cir.1988), *cert. denied,* — U.S. ——, 109 S.Ct. 802, 102 L.Ed.2d 793 (1989).

Racial prejudice is a "mental bias ... unrelated to the specific issues that the juror was called upon to decide." A habeas petitioner in a capital case, therefore, may take testimony from a trial juror to show that the juror possesses racial biases that, under the Eighth Amendment standard, created an "unacceptable risk" that race affected the death penalty decision.[7] However, under the Equal Protection claim, Dobbs must go further and show that the sentencing decision was actually motivated by racial prejudice. A conflict emerges between these two rules: whereas the *McCleskey* standard requires a petitioner to show actual bias in the sentencing decision, Rule 606(b) precludes inquiry into the decision making process.

In resolving that conflict, the Court initially notes that "Rule 606(b) strikes a balance between the defendants' right to a fair trial free from substantial juror misconduct, while protecting harassment of jurors, supporting the finality of verdicts, and preserving the community's trust in a system that relies on the decisions of lay people." *United States v. Sjeklocha,* 843 F.2d 485, 488 (11th Cir.1988). The Court is aided further in its analysis by the Supreme Court's decision in *Tanner v. United States,* 483 U.S. 107, 107 S.Ct. 2739, 97 L.Ed.2d 90 (1987), where a juror stated, post-verdict, that several of the jurors consumed alcohol, smoked marijuana and ingested cocaine during the trial.[8] The Supreme Court first decided that the evidence was inadmissible under Rule 606(b) because juror intoxication is not an outside influence on the deliberations. The Court then determined that the defendant's Sixth Amendment right to a fair trial before an impartial and competent jury was not violated by the application of Rule 606(b) because the defendant's interest is "protected by several aspects of the trial process." The Court reasoned as follows:

> The suitability of an individual for the responsibility of jury service, of course, is examined during *voir dire.* Moreover, during the trial the jury is observable by the court, by counsel, and by court personnel.... Moreover, jurors are observable by each other, and may report inappropriate juror behavior to the court *before* they render a verdict.... Finally, after the trial a party may seek to im-

---

**7.** Arguably, a habeas petitioner should not be allowed to bypass the *voir dire* process and investigate the racial prejudices of the jurors after the verdict has been received. However, the State has not made that argument, and evidence of mental bias is admissible under Rule 606(b), pursuant to the language from *Rushen* that is quoted in the text. In any event, evidence that the sentencing decision was based on race, which the Supreme Court has said is required to show an Equal Protection violation, could not be obtained until the verdict has been rendered. Post-verdict evidence is essential in that context because although the *voir dire* process could reach evidence of an Eighth Amendment violation, it would not yield evidence needed to show an Equal Protection violation.

**8.** The evidence in *Tanner* was summarized by the Supreme Court as follows:

> [Juror] Hardy stated that he "felt like ... the jury was on one big party." Hardy indicated that seven of the jurors drank alcohol during

the noon recess. Four jurors, including Hardy, consumed between them "a pitcher to three pitchers" of beer during various recesses. Of the three other jurors who were alleged to have consumed alcohol, Hardy stated that on several occasions he observed two jurors having one or two mixed drinks during the lunch recess, and another juror, who was also the foreperson, having a liter of wine on each of the three occasions. Juror Hardy also stated that he and three other jurors smoked marijuana quite regularly during the trial. Moreover, Hardy stated that during the trial he observed one juror ingest cocaine five times and another juror ingest cocaine two or three times. One juror sold a quarter pound of marijuana to another juror during the trial, and took marijuana, cocaine, and drug paraphernalia into the courthouse. Hardy noted that some of the jurors were falling asleep during the trial, and that one of the jurors described himself to Hardy as "flying."
> 483 U.S. at 115–16, 107 S.Ct. at 2745.

peach the verdict by nonjuror evidence of misconduct. . . .

In light of these other sources of protection of petitioners' right to a competent jury, we conclude that the District Court did not err in deciding, based on the inadmissibility of juror testimony and the clear insufficiency of the nonjuror evidence offered by petitioners, that an additional post-verdict evidentiary hearing was unnecessary.

483 U.S. at 127, 107 S.Ct. at 2751 (emphasis in original) (citations omitted).

Dobbs' case is distinguishable from *Tanner* in that racial bias is not as observable as intoxication. Nevertheless, the law does permit evidence of racial bias to be admitted in several ways: during *voir dire,* by juror testimony about another juror's statements or conduct *prior* to the verdict, and by post-verdict evidence of a juror's bias. Given these methods of showing that race influenced the sentencing decision, Rule 606(b)'s prohibition ordinarily would not impair a defendant's ability to show an Equal Protection or Eighth Amendment violation.

■ In a given case, however, testimony of racial bias based on a juror's conduct or statements during the deliberations may become admissible notwithstanding Rule 606(b) if the admissible evidence of a juror's racial prejudice is so strong that the death penalty appears to have been imposed on the basis of the defendant's race. In the face of strong evidence that the defendant's constitutional rights, under the standards articulated in *McCleskey,* may have been violated, the statutory Rule 606(b) privilege would have to yield. In such a case, the balance between the defendant's rights and the society's interest in protecting the jury system would not be met by enforcing Rule 606(b).

Having resolved that conflict, the Court turns to the evidence that Dobbs presents of racial prejudice. The case law makes clear, however, that only certain types of prejudice entitle a habeas petitioner to relief from his sentence. In *Turner v. Murray,* 476 U.S. 28, 106 S.Ct. 1683, 90 L.Ed.2d 27 (1986), the Supreme Court decided that a defendant in a capital case where the defendant is black and the victim was white has a constitutional right to question the jury venire on their racial prejudices. The Supreme Court explained as follows:

Because of the range of discretion entrusted to a jury in a capital sentencing hearing, there is a unique opportunity for racial prejudice to operate but remain undetected. On the facts of this case, a juror who believes that blacks are violence-prone or morally inferior might well be influenced by that belief in deciding whether petitioner's crime involved the aggravating factors specified under Virginia law. Such a juror might also be less favorably inclined toward petitioner's evidence of mental disturbance as a mitigating circumstance. More subtle, less consciously held racial attitudes could also influence a juror's decision in this case. Fear of blacks, which could easily be stirred up by the violent facts of petitioner's crime, might incline a juror to favor the death penalty.

The *Turner* Court concluded that the petitioner had shown a constitutional violation because the trial judge's refusal to permit *voir dire* on racial attitudes created an unacceptable risk that "racial prejudice may have infected petitioner's capital sentencing."

In the instant case, therefore, Dobbs must establish that the jurors were influenced by racial prejudices, akin to the types described in *Turner,* that would make them more likely to impose the death penalty when the defendant is black than when the defendant is white. If the evidence of their biases in that regard is particularly strong, then the Court will examine the juror's testimonies concerning their mental processes during the deliberations.

Dobbs relies on several factors to show that racial prejudice tainted the sentencing decision. He first argues that the procedural safeguards outlined in *McCleskey* for eliminating the effects of racial biases from criminal trials in Georgia did not function in Dobbs' case. Specifically, Dobbs asserts that his attorney did not effectively conduct *voir dire* to discover racial prejudice and prevent it from infecting the proceedings.

The *voir dire* in Dobbs' case was by no means comprehensive. However, the fact

that Dobbs' attorney did not conduct an exhaustive *voir dire* examination does not mean that racial prejudice affected Dobbs' sentencing decision. The *McCleskey* Court discussed the *existence* of procedural safeguards to refute McCleskey's argument that his statistics, standing alone, showed an unacceptable risk that race was a factor at his particular sentencing. The Court did not find it necessary to determine whether those safeguards *actually functioned* in McCleskey's case.

In any event, the attorney's failure to conduct an exhaustive *voir dire* examination on racial views is cured by the lengthy deposition questioning on that topic that has been undertaken in connection with the instant habeas corpus proceeding. The perfunctory *voir dire* process has not impeded Dobbs' ability to examine the jurors' views.

The other evidence Dobbs relies on include statements made during the trial, the depositions of the jurors, the judge, and the defense attorney, and the racial climate of Walker County at the time of the trial.[9] That evidence shows that Dobbs was tried in Walker County, a primarily rural area of Northwest Georgia where approximately 4% of the population is black. For many years, the public institutions and business establishments were segregated racially. Desegregation efforts were not undertaken until they were compelled by the federal government in the 1960's.

The statements of the trial jurors reflect the segregated history of Walker County. Ten of the eleven deposed jurors[10] are white, and most were raised in segregated schools and social environments. Only a few of the jurors had social contacts with blacks when they were growing up,[11] and many of their contacts with blacks as adults are through work only.[12] The jurors' children did attend integrated schools, and some of them did have black playmates. Many jurors attend segregated churches, but also believe that blacks should be allowed to become members.[13] All the jurors expressed reservations about interracial dating and marriage, ranging from complete disapproval to respect for another person's choices.[14]

Most of the jurors understand the goals of Martin Luther King, Jr. insofar as they

---

**9.** The State has raised numerous objections to the admissibility of much of the deposition testimonies. The State's objections in general have been resolved in the Court's prior discussion of the admissibility of juror testimony. Rather than responding explicitly to each of the State's objections to the specific questions, the Court has based its decision solely on admissible evidence.

**10.** The twelfth trial juror is deceased.

**11.** *See* Petitioner's Exhibit 4 at 11; Petitioner's Exhibit 8 at 9, 12; Petitioner's Exhibit 10 at 15; Petitioner's Exhibit 12 at 7 (white jurors who had black playmates when they were children).

**12.** *But see* Petitioner's Exhibit 3 at 7–8; Petitioner's Exhibit 4 at 29–30, 32; Petitioner's Exhibit 8 at 21; Petitioner's Exhibit 12 at 11–12 (white jurors who have black friends).

**13.** *See* Petitioner's Exhibit 2 at 27, 46; Petitioner's Exhibit 3 at 26–27; Petitioner's Exhibit 6 at 45; Petitioner's Exhibit 10 at 25–26 (white jurors who believe blacks should be allowed in their churches);
*but see* Petitioner's Exhibit 7 at 16 (white juror who would feel uncomfortable in an all black church and who believes blacks would not be comfortable in an all white church).

**14.** *Compare*
Petitioner's Exhibit 3 at 22 ("I believe in blacks marrying blacks and whites marrying whites.... It's because of the children that come forth of those marriages. I do not believe that they really have a place with whites or blacks. But I mean, if she was a sweet little ol' girl I probably would love her just like a white one");
Petitioner's Exhibit 4 at 46–47 ("I hope that it wouldn't bother me a lot");
Petitioner's Exhibit 8 at 18–19 (interracial dating by her children would give her pause but she would not try to talk them out of a long term relationship);
Petitioner's Exhibit 10 at 37 (her thoughts about interracial dating "would be according to the person.... It would have been who it was, not the color of the skin");
*with*
Petitioner's Exhibit 6 at 24–25 ("I just don't believe in mixing people. Now, you can have them as friends. But I don't—I think that that child somewhere down the line is going to suffer because of it. And it's not just because of the black child, it's the black people having the white child. I just don't—I just don't agree with that");
Petitioner's Exhibit 7 at 18 (would not have allowed her daughters to date a black man).

perceived him as trying to obtain equal rights for blacks. Although several jurors were bothered by his methods and found him intrusive,[15] some were outspoken in their support for King's goals.[16] None of the jurors said that they agreed with the principles espoused by the Ku Klux Klan, although several said that they had no knowledge of the Klan, its ideas, or its activities.[17]

Several of the jurors referred to blacks as "colored," and none of them said whether it had negative connotations. Most indicated the word "nigger" was insulting and disrespectful,[18] although two jurors admitted using the word on occasion. One of those jurors said he uses the word when he intends to be negative,[19] and the other juror said she uses the word when she is with blacks who use the word themselves, and that the word is not negative anymore.[20]

When asked directly, none of the jurors stated that they viewed blacks as more violence prone than whites, or as morally inferior to whites.[21] Two of the jurors did express a fear of blacks.[22] To varying degrees, all the jurors said that their opinion of a black person depends on the qualities of the individual and/or that skin color does not determine those qualities.[23]

---

15. *See* Petitioner's Exhibit 3 at 19–20 ("I didn't particularly care for Martin Luther King. But the things he stood for in terms of helping the coloreds to come out and to make themselves known, I think that's right");

Petitioner's Exhibit 7 at 19–20 (Martin Luther King was "pushy and it seemed like everywhere he went there was a riot or something bad to happen. He was a preacher and should have stayed in the church. He was out of his place");

Petitioner's Exhibit 12 at 25–27 (Martin Luther King did things he believed in but was forward and disruptive).

16. *See* Petitioner's Exhibit 6 at 37–38 (Martin Luther King has "done the black people a lot of good as far as being leaders and being able to—maybe gave them confidence in themselves to try for these better things");

Petitioner's Exhibit 8 at 14, (Martin Luther King "was doing a good job. And I think what he was doing was right. . . . [H]e was making it a better place for his people as well as for other people. . . . [His tactics were needed] to get their attention"); *id.* at 41.

17. Dobbs cites the depositions of two of the jurors as expressing support for the Klan's activities. One of those jurors said that she heard that the Klan does "some good sometimes at Christmas time and all," but also added that "then I hear terrible things." She said further that "I have heard that they hate—I don't know if it's just black groups of people—unjust groups of people [too]." She said that she would not go to a Klan barbecue because she doesn't know what their beliefs are. Petitioner's Exhibit 2 at 40–41.

In the other deposition cited by Dobbs, the juror said that she knew nothing about the Klan and that she has heard people say they do some good things, but that she has not heard specifically what those good things are. Petitioner's Exhibit 8 at 21.

The Court concludes that neither of these jurors expressed agreement with the Klan's outspoken hatred of blacks, as well as other classifications of people.

18. *See, e.g.,* Petitioner's Exhibit 8 at 19; Petitioner's Exhibit 10 at 27; Petitioner's Exhibit 11 at 22.

19. Petitioner's Exhibit 4 at 43–44.

20. Petitioner's Exhibit 12 at 20.

21. Dobbs cites the depositions of two of the jurors as showing a belief that blacks are inferior morally to whites. One of those jurors stated that in her estimation, the morals of Dobbs' family *in particular* were low, *not* those of blacks as a race. Petitioner's Exhibit 9 at 61. The other juror stated that she would not have allowed a black man to date her daughter. Petitioner's Exhibit 7 at 18. Although that statement evinces a view of blacks as different from whites, it does not necessarily mean that she views blacks as morally inferior.

22. Dobbs cites the depositions of three of the jurors as expressing fear of blacks. One of those jurors said that she would fear a black on the street, but added that she would not want to be "out there in the dark" with some whites either. Petitioner's Exhibit 7 at 16. Another juror said that a lot of people she knew are more afraid of blacks than whites and that she "guessed" she felt a little bit the same way. Petitioner's Exhibit 11 at 32–33.

The third juror cited by Dobbs did not express the same sentiments. She stated that Dobbs *in particular* looked "eerie" during the trial, not that blacks in general are scary. Petitioner's Exhibit 3 at 31. The Court therefore concludes that only two of the jurors said that blacks are scarier than whites.

23. *See* Petitioner's Exhibit 2 at 31 (blacks are not lazier by nature than whites); *id.* at 37 (blacks deserve to be given a job over whites if they are qualified);

Petitioner's Exhibit 3 at 18–19 ("There's good whites and there's bad whites. There's good

The trial judge, who was also deposed, grew up in Walker County during the segregation era. His contacts with blacks as a child were limited to housekeepers. The judge worked with blacks after he graduated from college and had a close black friend in the military. As a state legislator from 1951 to 1962, the judge voted consistently for bills that renounced the Supreme Court's integration decisions.[24] As a state court judge, he presided over cases where both blacks and whites were given the death penalty for killing whites.

The trial judge referred to blacks as "colored" during his deposition, and called Dobbs "colored" at the trial. In his deposition, he stated that his mother had taught him to use the word "colored" because "black" did not sound good, and that he has never used the word "nigger." At one point, he said "let's call them blacks."

Dobbs' trial attorney was outspoken about his views. He said that many blacks are uneducated and would not make good teachers, but do make good basketball players. He opined that blacks are less educated and less intelligent than whites either because of their nature or because "my granddaddy had slaves." He said that integration has led to deteriorating neighborhoods and schools, and referred to the black community in Chattanooga as "black boy jungle." He strongly implied that blacks have inferior morals by relating a story about sex in a classroom. He also said that when he was young, a maid was hired with the understanding that she would steal some items. He said that blacks in Chattanooga are more troublesome than blacks in Walker County. He did say, however, that Martin Luther King, Jr. was "a great man."

The attorney stated that he uses the word "nigger" jokingly. He testified further that, in his experience as a criminal defense lawyer, a black accused of killing a white is more likely to be convicted than a black charged with killing a black, although he did not know why. He also said that he found Dobbs to be arrogant and uncooperative during the trial, and he believes that Dobbs would have been given

blacks and there's bad blacks"); *id.* at 23 ("color would be the only difference [between blacks and whites]. I mean, they're all human beings. They're no different than Mexicans. Of course, some people don't like Mexicans or the Jews, I don't have anything against Jews. We're all created by God, we're created in his image. We are somebody, we are a living soul");

Petitioner's Exhibit 4 at 32 ("there's good white folks and there's good black folks"); *id.* at 41 ("there's blacks that have got a lot more than I've got that's born in this world and they are not underdogs. And there's blacks that have got a lot less than I've got that are born in this world and I guess they're underdogs. There's whites that have got a lot less than I've got that are underdogs. The whites that have more than I have, they've got an advantage. I don't see where you can say black and white, black and white, it's people");

Petitioner's Exhibit 5-2, the deposition of the only black juror, at 22 ("I just have never been on a black or white issue, I think of people as being people.");

Petitioner's Exhibit 6 at 24 ("I don't think that it's just the black communities that has the problems.... Where they're thickly settled, I guess. There's always problems going on where there's a lot of people"); *id.* at 26 ("morals don't have anything to do with black or white.");

Petitioner's Exhibit 7 at 17 (the main difference between black people and white people is "their color ... that's all.");

Petitioner's Exhibit 8 at 26–27, 31–32 (doesn't know what the main difference between black people and white people is, but doesn't believe blacks are lazier or more prone to violence);

Petitioner's Exhibit 9 at 44 ("some black people are inferior and some white people are inferior. We all have some of that complex"); *id.* at 48 (some blacks "are more intelligent [than whites] and some of them they have more knowledge of their job, their position. And some of them—I've been in some [business] meetings where I had black leaders that I felt because they were black they were in that position and they were really not qualified. And I have been in meetings with whites that were not qualified for their jobs. So it works both ways.");

Petitioner's Exhibit 10 at 20–22 (how people decide to lead their lives, including being ambitious, "comes back to the individual.");

Petitioner's Exhibit 11 at 21 ("I respect [blacks] for the simple reason that they' can't help the color of their skin more than I can help the color of my skin.");

Petitioner's Exhibit 12 at 19 ("there are good blacks and there are good whites. There are bad blacks and there's bad whites." The less fortunate people, whether they are black or white, need help through government programs).

24. Petitioner's Exhibit 16.

the death penalty regardless of his degree of cooperation.

The trial transcript reveals that the judge and defense lawyer referred to Dobbs as "colored" and "colored boy" and that the prosecutor called Dobbs by his first name at one point.

Alex Willingham, a political scientist, testified that he investigated the history of racial attitudes in Walker County, including those that existed when Dobbs was tried, by reading local newspaper articles, interviewing black residents of the county, and examining voting patterns.[25] Based on his research, Willingham concluded that race relations were on the minds of the people in the area during the time of the trial, as reflected in the struggle over ending segregation. Willingham also reviewed the depositions, and believed race was a factor at Dobbs' trial. He highlighted various portions of the depositions, such as the use of the word "colored" and the defense attorney's views of blacks. He said that the word "colored" reveals a view of blacks as different from, and ultimately inferior to, whites. He opined that because value systems are so ingrained, the jurors could not "effectively conceive of Dobbs as an individual free of their racial stereotypes."

Based on the evidence presented, the Court finds that Walker County's history of racial segregation appears to have had some influence on the values of the players in Dobbs' case. The jurors, the trial judge and the defense attorney were raised in segregated environments and continue to interact primarily with individuals of their own race. The attorney expressed beliefs, often in pointed ways, that blacks in general are inferior to whites morally and intellectually. As the Supreme Court stated in *Turner v. Murray*, one with his beliefs might be inclined to favor the death penalty when the defendant is black. Further, the references at trial to Dobbs as "colored" may have had an influence on the jury's view of Dobbs as an individual. Al-

though "colored" may have been an acceptable term when the judge and attorney were growing up, their continued use, especially in a courtroom setting, evinces a degree of insensitivity to black concerns.

The personal views of the defense attorney, however, were not expressed at trial, and the attorney himself did not decide Dobbs' penalty. The personal views of the judge and prosecutor, which have not been shown to be racist, similarly were not related to the jurors. The evidence therefore does not show that these individual's racial attitudes, apart from the trial references discussed above, affected the sentencing deliberations.

Without a doubt, many of the jurors believe that the races should mix to a limited extent only. In a subtle way, a belief that blacks are inferior to whites may underlie segregated beliefs insofar as blacks may be seen as a threat to the stability of the white society. Also, many of the jurors used the word "colored," which as discussed shows insensitivity to racial matters. On the other hand, though, the jurors said that their opinion of a black person is based on his characteristics as an individual and not on his race.

The testimony of Willingham regarding the history of race relations in Walker County and the significance of race in the minds of the county's residents at the time of the trial is interesting from a social science perspective. Under the Supreme Court's reasoning in *McCleskey*, however, the likelihood of race being a factor in a particular case is insufficient standing alone to show that race was actually a factor in a particular case. Given the requirement for specific evidence of the biases of the decision makers in Dobbs' case, Willingham's testimony of race relations in general is of little relevance to the resolution of the issues presented for decision. His interpretations of the depositions, on the other hand, are helpful to the Court in

---

**25.** The State objects to Willingham's testimony on several grounds, including his competency as an expert, the method of his research, and that the sources of the research are hearsay and are not in the record. The objections to the methods and sources of the research are well taken.

Additionally, as discussed *infra,* given the Supreme Court's admonition in *McCleskey* that evidence of racial bias must be specific to the petitioner's case, evidence of racial climate in a community is of little moment.

making its independent judgment about the mental biases of the decision makers.

■ After considering all the evidence, the Court concludes that Dobbs has not shown a risk of racial prejudice affecting the sentencing decision to the extent that the death penalty was given unconstitutionally. Although the jurors possess some racial prejudices, and some more so than others, Dobbs has not shown that the jurors, either individually or as a whole,[26] were influenced by prejudices that would make them favor the death penalty for a black person who murdered a white person.

■ Based on these findings, the Court concludes that Dobbs has not shown an Eighth Amendment violation, that an unacceptable risk existed that racial considerations affected the jurors' decision to impose the death penalty. Further, the evidence does not reach the level, described above, that would permit inquiry into the jury's deliberations. The Court therefore concludes additionally that Dobbs has not shown that the issuance of his death verdict violated the Equal Protection Clause.

IV. *Jurors Voted Automatically for Death*

Dobbs argues that the jurors' testimonies indicate that they misconceived the role of aggravating circumstances and voted automatically for the death penalty based on the murder alone. He argues further that some of their statements about voting automatically for death shows that they were not qualified to hear a capital case.

The State responds that the issue was not raised in the state courts or this Court, and also that Dobbs is not entitled to relief on the merits.

The Court has previously determined that the jury instructions on the role of aggravating circumstances were clear and that Federal Rules of Evidence 401 and 606(b) preclude inquiry into the jury's understanding of those instructions. Dobbs' claim that the jury disregarded those instructions and voted for death automatically in his case is therefore rejected.

Dobbs' claim that the jurors were not qualified due to their views on capital punishment is also without merit. In *Ross v. Oklahoma*, 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988), the Supreme Court reiterated that "the proper standard for determining when a prospective juror may be excused for cause because of his or her views on capital punishment ... is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instruction and his oath.'" *Id.*, 108 S.Ct. at 2276, *quoting Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985), *quoting Adams v. Texas*, 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980).

■ First, Dobbs' claim is barred under the procedural default doctrine because Dobbs did not move to strike the jurors at trial and has not shown cause for that default. *See Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). The jurors' attitudes about capital punishment were certainly discoverable at that time. Second, Dobbs has not shown that the jurors were not qualified. In their depositions, the jurors, for the most part, gave their views on the propriety of the death penalty in Dobbs' *particular* case.[27] Moreover, there is no proof that they would have been unable to follow the judge's instructions concerning aggravating and mitigating circumstances.

---

26. When a habeas petitioner challenges the prejudice of the jury, the standard is prejudice regarding the trial jury as a *whole*. *See Patton v. Yount*, 467 U.S. 1025, 1032, 104 S.Ct. 2885, 2889, 81 L.Ed.2d 847 (1984); *Bundy v. Dugger*, 850 F.2d at 1426; *Jordan v. Lippman*, 763 F.2d 1265, 1277 (11th Cir.1985). On the other hand, when a petitioner claims that an individual juror was impartial, the question "is plainly one of historical fact: did a juror swear that he could set aside any opinion he might hold and decide the case on the evidence, and should the juror's protestation of impartiality have been believed." *Patton v. Yount*, 467 U.S. at 1036, 104 S.Ct. at 2891.

27. *See, e.g.*, Petitioner's Exhibit 2 at 34; Petitioner's Exhibit 3 at 31–32; Petitioner's Exhibit 4 at 58–59; Petitioner's Exhibit 6 at 32; Petitioner's Exhibit 7 at 27; Petitioner's Exhibit 10 at 36.

**1580**

## V. The Trial Court's Refusal to Answer the Jury's Question About Parole

During the penalty phase deliberations, the trial judge was informed that the jurors had a question. The judge called the jury in, whereupon the following colloquy occurred:

THE FOREMAN: We the jury would like to know on the—say a felony from 1 to 10 years, we would sentence them to 10 years, would he be eligible for parole within that 10 years?

THE COURT: Now that is a question that the Court cannot comment on. I think that if I commented on anything like that, I know it would be reversible error. I just cannot answer it because the law won't let me do so. I'm sorry.

Trial Transcript at 519.

Dobbs states that under Georgia law today, the trial court would be required to inform the jury that parole cannot be considered, and argues that a judge should be required to do so by federal law as well.[28] The State responds that a jury may consider the possibility for parole but that, in any event, there is no evidence that the jurors in Dobbs' case considered parole.

■ The State's position, that the jurors did not consider parole, strains credulity given their straightforward question in the midst of their deliberations. However, despite Dobbs' strong reasons for requiring a jury to be told not to consider the possibility of parole, his argument for a constitutional rule is foreclosed by circuit precedent. In *Tucker v. Zant,* 724 F.2d 882 (11th Cir.1984), *vacated on other grounds,* 474 U.S. 1001, 106 S.Ct. 517, 88 L.Ed.2d 452 (1985), a capital case, the Eleventh Circuit was presented with facts strikingly similar to those at bar. The *Tucker* Court reasoned as follows:

Tucker points out that, when the jury foreperson asked about the possibility of parole from a life sentence, the trial court simply refused to answer the question. Tucker argues that the court, once it knew that the jury was considering the possibility of parole, was constitutionally required to instruct the jurors to disregard parole in its deliberations. The trial court's refusal to discuss parole was based on Georgia law, which prohibits the jury in any criminal case from being informed of the possibility of parole. O.C.G.A. § 17-8-76(a). In *California v. Ramos,* [463] U.S. [992], 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983), the Supreme Court held that the Constitution does not prohibit notifying the capital sentencing jury of the power of the governor to commute a [death] sentence [to] life without parole. *We must conclude, therefore, that defendants in the sentencing phase of a capital murder trial have no federal right to prevent jury consideration of the possibility that they will be paroled if sentenced to life imprisonment. Consequently, the trial court's failure to instruct Tucker's jury to disregard that possibility could not have violated the Constitution.*

*Id.* at 892 (emphasis added); *see also Kordenbrock v. Scroggy,* 680 F.Supp. 867, 893 (E.D.Ky.1988).

On the authority of *Tucker,* the trial judge's refusal to answer the Dobbs jury's question regarding parole was not constitutional error.

## VI. Unconstitutional Form of the Verdict

Dobbs argues that the form of the jury's verdict was unconstitutional. The language of the verdict reads as follows:

On Count Five we the jury fix the punishment of the defendant to be punished death [sic] by electrocution since the offense of murder was committed while the Defendant was engaged in the commission of another capital felony.

28. Dobbs' assertion of Georgia law appears correct. In *Quick v. State,* 256 Ga. 780, 787, 353 S.E.2d 497 (1987), the Georgia Supreme Court ruled that "[i]f, and only if, the jury asks to be instructed about the possibility of parole, the court should mention the issue only to the extent of telling the jury in no uncertain terms that such matters are not proper for the jury's consideration." The Court "suggested" that the following language be used: "You shall not consider the question of parole. Your deliberations must be limited to whether this defendant shall be sentenced to death or whether he shall be sentenced to life in prison. You should assume that your sentence, whichever it may be, will be carried out." *Id.* at 787 n. 3, 353 S.E.2d 497.

Trial Transcript at 520. Dobbs contends that the verdict is unconstitutional because it reflects the jury's misconceptions (1) that the death penalty was automatic once an aggravating circumstance was found, and (2) that they did not even need to find an aggravating circumstance apart from the murder. The State responds that the jury charge, taken as a whole, demonstrates that the meaning of the jury's verdict was clear.

■ The Court rejects Dobbs' arguments because the verdict language accurately reflects one of the choices the jury legally could decide. Given that the trial court's instructions on aggravating and mitigating circumstances were constitutionally sufficient, as discussed above, there is no admissible evidence that the jurors misconceived their alternatives.

### VII. *Jurors Thought Death Would Not Actually Be Imposed*

■ Dobbs contends that the jurors did not think that Dobbs would in fact be executed. He points out that the trial oc-

curred after *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), struck down the death penalty statute and before *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), once again permitted executions. Dobbs notes further that some of the jurors' testimonies reflect that misconception, and that the trial judge's failure to answer their question on parole "only added to the juror's anxiety regarding the release of Mr. Dobbs."

The Court rejects Dobbs' argument because the jurors' testimonies concerning their deliberations are inadmissible under Federal Rules of Evidence 401 and 606(b), as discussed, and Dobbs' interpretation of the jury's question is speculative.

ACCORDINGLY, Dobbs' petition for a writ of habeas corpus is DENIED.

IT IS SO ORDERED, this the 7th day of August, 1989.